## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| DEVELOPMENT DESIGN GROUP, INC. | : | |
| | : | |
| | : | |
| v. | : | |
| | : | Civil Action No. CCB-10-53 |
| | : | |
| MICHEL DELLER, ET AL. | : | |
| | : | |
| | : | |

...o0o...

## MEMORANDUM

Plaintiff Development Design Group, Inc. ("DDG") has sued three defendants for breach of contract: Michel Deller ("Deller"), Centro Comercial Los Chillos ("Los Chillos"), and Urbanizadora Naciones Unidas ("Urbanizadora"). The dispute arose out of a contract under which DDG was hired to provide design services for a shopping center to be built near Quito, Ecuador, called the Hacienda San Luis ("HSL" or "the HSL project"). DDG alleges that defendants failed to recognize DDG publicly as the "Design Architect" of the project as required by the contract.

Defendants have filed a motion to dismiss for lack of personal jurisdiction. In the alternative, defendants Deller and Urbanizadora have moved for summary judgment on the grounds that they cannot be liable for breach of contract because they were not parties to the contract. The issues have been fully briefed and no further hearing is necessary. *See* Local Rule 105.6 (D. Md. 2011). For the reasons stated below, the motion to dismiss for lack of personal jurisdiction will be denied, but summary judgment will be granted as to Deller and Urbanizadora.

# I.  BACKGROUND

## A.  The parties

DDG is an architectural design firm based in Baltimore, Maryland.  Its employees "travel the world performing architectural services" for clients in an "extensive" number of countries, including Turkey, China, South Africa, Indonesia, Guatemala, Colombia, Venezuela, Panama, Costa Rica, Bolivia and Ecuador.  (Higgs Dep. 11, 26–27, 169–70, ECF No. 46-2; Clark Dep. 19–20, ECF No. 46-4.)  To market its services, DDG advertises in national and international trade journals and its employees present at conferences, attend international seminars, and publish articles.  (Higgs Dep. 20–22, 156–59.)

Michel Deller is a resident and citizen of Ecuador.  (Second Deller Aff. ¶ 1, ECF No. 18 Ex 2.)  He is the general manager of Urbanizadora, is an owner of Los Chillos, and represented Los Chillos as general manager or as an agent at the time Los Chillos hired DDG to perform design services for the HSL project.  (*Id.*; Deller Dep. 487, ECF No. 46-5.)  In addition to, or related to, his work with Urbanizadora, Deller owns an architecture and design firm, MDK.  (Lopez Dep. 53, ECF No. 46-8.)  His office is located in Urbanizadora's offices in the Quicentro shopping center, and he receives all his mail there.  (Deller Dep. 147.)  Deller is an owner of and on the board of Ekron, a construction company; is a member of the International Council of Shopping Centers for South America; is on a committee of advisors to the Mayor of Quito; and is the president of an airport services company and a professional soccer team.  (*Id.* at 11–15.)

Deller has only been in Maryland on two occasions, both of which are discussed below.  While he has not traveled often to Maryland, Deller has traveled often to the United States.  He graduated with a degree in architecture from Washington University-St. Louis, and his wife is a

U.S. citizen whose family lives in Miami.  (Deller Dep. 8, 32.)  His daughter is in school in Boston, and Deller has visited her there.  (*Id.* at 332.)  Deller is also an officer and a beneficiary of several trusts with real estate holdings in Florida and California.  (*Id.* at 383–99, 464–67.)

Urbanizadora is a real estate development company that was formed under the laws of Ecuador in 1974.  (*Id.* at 67, 78–79.)  During 2005 and 2006 (the time period when the HSL project was being developed), sixty percent of Urbanizadora was owned by "a trust in the name of" Alberto and Frida Deller, Michel Deller's parents.  (*Id.* at 72.)  Michel Deller owned thirteen percent, his sister Helen owned another thirteen percent, and his late brother's children owned the last thirteen percent.  (*Id*. at 75.)  Michel Deller is and was at all relevant times the general manager of the company, a position comparable to CEO.  (Second Deller Aff. ¶ 1.)  Alberto Deller, Michel's father, was the company's president around 2005; Michel's sister, Helen, later became its president.  (Deller Dep. 68, 75–76.)

Urbanizadora "promotes projects."  (*Id.* at 78.)  Although other companies, also owned by members of the Deller family, perform other roles, such as construction or architectural design, Urbanizadora does not itself do design or construction; rather, it owns land and promotes real estate development on its land.  (*Id.* at 78–79.)  One of its principal assets is a shopping center called Quicentro Shopping in Quito, Ecuador.  (*Id.* at 127.)

Los Chillos is an Ecuadorian corporation that was formed in December 2003 by Juan Carlos Bustamante Calisto ("Bustamante") and General Brigadier Angel Cordova ("Cordova"), the former chief of the Ecuadorian equivalent of the United States Joint Chiefs of Staff.  (Deller Dep. 63–64; Corporate Registration, ECF No. 46-6, at 2.)  At some point thereafter Alberto Ferro became a part-owner of the company.  (Deller Dep. 70.)  When Los Chillos was formed, Deller was not part of the company and did not have any financial interest in it.  (*Id.* at 66–67, 158–59.)

3

In 2005 or 2006—or possibly in 2004 (*id*. at 448–49)—a company called Dellair, which, like Urbanizadora, was owned at least in substantial part by the Deller family, purchased a fifty percent ownership stake in Los Chillos.  (*Id*. at 70–71, 115.)[1]  Half of that stake was held by "trusts that are held by [Michel Deller's] parents, and some with family members and not direct family members."  (*Id*.)  Another twenty-five percent of Dellair was held by a company called Shopping Center Investment Corporation.  (*Id*. at 71.)[2]  Around the same time Dellair became a part-owner of Los Chillos, somewhere in or between 2004 and 2006, Michel Deller became Los Chillos's general manager.  (*Id*. at 67, 448–49.)  While Cordova is now the general manager of Los Chillos (*id*. at 376), Deller was authorized to fill out interrogatories and testify at a deposition on behalf of the company for this lawsuit.  (*Id*. at 24, 26.)

Los Chillos owns the land on which the Hacienda San Luis was built, financed the development of the HSL, and today owns the buildings that constitute the HSL.  (*Id*. at 76–77; Second Deller Aff. ¶ 3.)  In these ways, Los Chillos's role with respect to the Hacienda San Luis is analogous to Urbanizadora's role with respect to the Quicentro shopping center.  (Deller Dep. 77.)  Los Chillos has never had an office in Maryland or any financial interest in property in Maryland, nor has it had any employees in Maryland.  (Second Deller Aff. ¶ 4.)

### B.  The relationship between the parties prior to the HSL project

Michel Deller was first introduced to DDG sometime between 1996 and 1998, when he and John Clark, then-president of DDG, met during an International Council of Shopping Centers convention in Las Vegas.  (Deller Dep. 43, 86–88; Third Deller Aff. ¶ 2, ECF No. 27-1.)

---

[1] Dellair was "afterwards absorbed or purchased" by a company called Reference Corp.  (Deller Dep. 112.)
[2] Deller himself does not personally own any shares of Los Chillos, but he does own shares in other entities that hold shares in Los Chillos.  In all, through those companies, including Shopping Center Investment Corporation, he personally owns twenty-five percent of Los Chillos.  (*Id*. at 450, 458.)

They were introduced by owners of a project in Singapore (or the Philippines—the record is unclear). (Clark Dep. 237–38; Deller Dep. 86–87.) Urbanizadora was "promoting" a project by an entity called Inmobiliaria Nuevo Mundo Inmomundo ("IMNI") to develop a shopping mall called San Marino in Guayaquil, Ecuador, for which it was planning to use an architectural design firm in Texas and were "pretty close to reaching an agreement with them." (Deller Dep. 43, 87.) The third parties told Deller, "before you do anything, talk to Mr. Clark." (*Id.* at 87.)

Clark told Deller that DDG had never done a project in South America, but was interested in expanding into the region. According to Deller, Clark asked for the opportunity to "do a project" for Deller or one of his companies. (*Id.*) Deller invited Clark and his colleagues at DDG to do a "charrette" (*id.*)—design and architectural parlance for "a workshop with one's client or his team." (Higgs Dep. 135) As Deller described it, the plan was "to design the whole project, in essence," to develop a design concept and a "master plan," and to begin creating models. (Deller Dep. 87.) Clark travelled to Ecuador with two or three DDG colleagues and spent four or five days developing a design for the San Marino shopping center. (*Id.* at 89–90.)

Michel Deller and his colleagues were impressed, and they retained DDG to complete the final design. (*Id.* at 91–93.) DDG and INMI entered a contract in January 1999. (San Marino Plaza Agreement, EFC No. 46-10, at 11–20.) During his deposition, Clark did not recall INMI. (Clark Dep. 34–35.) INMI seems to have been the owner of the project; Urbanizadora's role was in "promoting" the project. (Deller Dep. 43.) There is no information in the record of whether Urbanizadora or the Deller family had an interest in INMI, though the contract lists INMI's address as the same as Deller's—in the Quicentro Shopping building in Quito. (ECF No. 46-10, at 12.) Guillermo Lopez, another DDG employee who began working on the San Marino

project, testified that he believed INMI was a "Deller-related entit[y]" and that, ultimately, Deller was an owner of the project. (Lopez Dep. 125–26).

From the first project, Clark, Lopez and Deller "developed a profound bond of friendship, of almost like family." (Deller Dep. 93.) Over the course of the relationship, DDG was hired many times to provide design services for projects linked to Urbanizadora or the Deller family. As Deller describes the relationship, "[w]e were working in a continuous way with them." (*Id.* at 280.) DDG provided design services for the construction of a synagogue in Quito beginning in March 1998. (Clark Dep. 25–27; Quito Synagogue Proposal of Services, ECF No. 46-10, at 1– 5.) Around the same time, DDG provided design services to enhance the façades and food court at Urbanizadora's "Quicentro Shopping" shopping mall in Quito. (Clark Dep. 29–31; Quicentro Shopping Proposal of Services, ECF No. 46-10, at 6–10.) Urbanizadora also hired DDG to provide design services for an expansion and renovation of Quicentro Shopping in late 2000 (Clark Dep. 42; ECF No. 46-10, at 23); a Japanese restaurant that was being opened by Michel Deller's brother and his wife in late 2000 (Clark Dep. 43–44; Deller Dep. 278, 283–84; ECF No. 46-10, at 24); a multi-building residential project called Villa Regina beginning in early 2001 (Clark Dep. 40–41, 44–46; Villa Regina Design Development Services, ECF No. 46-10, at 21– 22, 25); a food court in the San Marino shopping center in mid-2002 (Clark Dep. 49–50; ECF No. 46-10, at 27); signage for the San Marino shopping center in early 2003 (Clark Dep. 53–55; ECF No. 46-10, at 33–38); and two projects to further expand the Quicentro Shopping center, providing "façade modifications" and designing a cinema in late 2003. (Clark Dep. 56–66; "Standard Form of Agreement . . . for Quicentro," ECF No. 46-10, at 40–56.)[3]

---

[3] The documents describing these projects were created by DDG and produced by DDG during discovery. Deller testified that his companies maintain records for three years as required by Ecuadorian law, but that they otherwise dispose of old contracts after a project is finished. (Deller Dep. 279–81.) Deller asserts he never saw the DDG-

For each of these projects, Urbanizadora was listed as the owner, and where a billing contact or "attention" line appears in the corresponding documents, Michel Deller's name was provided. According to Deller, however, he was "not the owner" of any the companies that hired DDG, nor have exclusive decision-making authority to hire DDG. (Deller Dep. 102.) Rather, "every one of the decisions at the end came down to [his] father." (*Id.*)

Michel Deller only met with DDG employees in the United States on three occasions. The first meeting occurred in Baltimore in the late 1990s, when Deller was in New York City for other reasons. (*Id.* at 342.) DDG had already completed its work on the San Marino project, but the construction was on hold due to economic conditions in Ecuador. (*Id.* at 342–46.) Deller traveled to Baltimore to visit DDG's offices "because he had never seen" the office, and wanted to see the model of the San Marino development. (Clark Dep. 179.) Clark gave Deller a tour of the offices and introduced Deller to Roy Higgs, a partner at DDG who was the president of DDG during the HSL contract. (Deller Dep. 344–45.)[4]

The second meeting occurred in December 1999 when Clark, Michel Deller and Alberto Deller traveled to Miami to meet about DDG's work on the Villa Regina project. (Clark Dep. 173–74.) The meeting was unrelated to the HSL project. (Lopez Dep. 188.) The third meeting occurred in Baltimore, in 2009, after DDG had stopped working on Deller projects. The visit was not for business reasons, but because Deller's father was being treated at Johns Hopkins. (Deller Dep. 346.) While in Baltimore, Deller and his father met for dinner with Clark and Lopez. (Lopez Dep. 185–86.) Clark describes the dinner as "purely social" (Clark Dep. 181.)

---

produced documents during the course of the projects described in them. (*Id.* at 278–79, 289–90, 296.) He does not dispute, however, that Urbanizadora hired DDG for design services on those projects.

[4] Higgs began working for the company that became DDG in 1979 and has been the CEO of DDG for "as long as [he] can recall." (Higgs Dep. 11–12.) In 2004, during the HSL project, he was "either president or CEO." (*Id.*) Clark sold all his stock in DDG and stepped down as President in 2003, becoming only a consultant to DDG (Clark Dep. 136), so presumably Higgs had become President by the time the HSL contract was negotiated.

### C.  The origins of the HSL project

Sometime in 2003 or 2004, Alberto Ferro, who was a part-owner of Los Chillos, approached Deller and proposed that they "co-participate in the development of Hacienda San Luis." (Deller Dep. 106–07; Clark Dep. 87.)  Sometime thereafter, when Clark and Lopez were in Ecuador to work on design for a remodeling of Quicentro (Deller Dep. 155), Deller suggested that they drive around and look at property on which DDG could participate in development projects.  (Clark Dep. 89–90.)  They, along with Alberto Deller, visited land owned by Los Chillos.  (*Id.* at 86–89; Deller Dep. 107.)

Clark had designed the first shopping center in the United States that resembled a "town center" and "wanted to take this concept to Latin America."  (Clark Dep. 82–83.)  He had seen "numerous pieces of land all over the Quito area [and the] Guayaquil area," and when he saw the Los Chillos land, he "suggested" to Deller that Deller "let [DDG] do a concept for a town center."  (*Id.* at 83.)  The idea of developing a town center was a "new concept" to Deller, so Clark showed Deller pictures of a town center Clark had designed in Columbus, Ohio, so Deller "would understand" the concept.  (*Id.* at 84.)  According to Deller, John Clark was "the brain and the genius behind San Luis."  (Deller Dep. 162.)  He "came up with this brilliant idea to unite [several] pieces of land to come up with this project."  (*Id.*)  Clark agreed, though he noted that he saw his role as helping Deller to be "cutting edge" and that Deller had specifically asked him to come up with "new ideas" for Deller-related projects.  (Clark Dep. 85.)

At the time, no Deller entity had an ownership interest in Los Chillos or the land owned by Los Chillos, so the Dellers "proceeded to enter a negotiation with Alberto Ferro and with Juan Carlos Bustamante."  (Deller Dep. at 108–09.)  Ferro and Bustamante agreed that Los Chillos

8

would sell a 50 percent interest in the land they owned—and therefore in the company—to Dellair. (*Id*. at 109–11.) As Deller describes their agreement, "we would purchase 50 percent of the land capitalizing the property, and be in charge of coming up with this whole concept of the town center, the development of the town center, leasing it, and doing everything necessary to give it life." (*Id*. at 109.) Once Dellair capitalized the project by buying into Los Chillos, Los Chillos could use the money from the Dellair deal to buy the adjacent land necessary to build out the full town center. (*Id.* at 110.)[5]

### D. Urbanizadora's role in developing the HSL project

The precise role that Urbanizadora played in the HSL project is unclear from the record. Deller, at some point, appears to have been simultaneously the general manager of both Urbanizadora and Los Chillos. And until the HSL project was completed, Los Chillos's address was the same as Urbanizadora's; all mail sent to Los Chillos was sent to the same office as mail sent to Urbanizadora. (Deller Dep. 229–31.)

Urbanizadora describes itself as "the company that developed the preliminary idea for the [HSL] Shopping Center prior to the formation of Centro Commercial [*sic*] Los Chillos." (Urbanizadora's Resp. to Interrog. No. 13, ECF No. 47-9.) After Los Chillos was formed, but before Dellair acquired an interest in Los Chillos, Urbanizadora's role was "to propel the [HSL] project along." (Deller Dep. 161.)

On April 23, 2004, DDG provided an "Authorization for Design Services" to Deller, seeking approval for DDG to send John Clark, Guillermo Lopez and Pipat Esara to Quito for a "work session" on April 26-30, 2004, for a fee of $25,000. (ECF No. 46-7.) The subject of the

---

[5] It is not clear that this is exactly how the adjacent land purchase actually happened. Later in his deposition testimony, Deller suggested that Deller-related entities may have simply purchased the land themselves and then transferred it to Los Chillos as part of their "capital investment." (Deller Dep. 247.)

form was "San Luis Master Plan and Office Park Development." (*Id.*)  The form was addressed

from Guillermo Lopez at DDG to "Michel Deller, Urbanizadora Naciones Unidas." (*Id.*)  Clark

referred to the work completed on the trip as a "master planning charrette" for the HSL project.

(Clark Dep. 176–77.)  Clark was asked about this form and trip:

> Q:      Am I to understand that, in essence, what this represents is a request for
>         services that -- that DDG provide some services to Urbanizadora so that it
>         could use those services, the results of those services, the master plan, for
>         example, in order to present its ideas of the shopping center to a
>         prospective partner?
>
> [Objection]
>
> A:      Yes.

(*Id.* at 266–67.)  When Clark was asked whether he "consider[ed] Urbanizadora [DDG's] client

at that time," Clark responded, "Yes." (*Id.* at 207.)

In accounting for Urbanizadora's HSL-related payments to DDG, Deller described them

as a "capital investment" in Los Chillos.   In his original affidavit, Deller stated that

"Urbanizadora Naciones Unidas was the company that developed the Shopping Center" (Deller

Aff. ¶ 3, ECF No. 8-2).[6]   When asked the meaning of this statement, Deller explained that

Urbanizadora had paid "part of the architectural fees" on the project "as a capital investment in

Centro Comercial Los Chillos." (Deller Dep. 338.)

Deller explained the relationship in slightly different terms in his Second Affidavit,

stating that Urbanizadora "was the company that first originated the development of the

Shopping Center," but that it "has since transfered [*sic*] its interest to" Los Chillos.  (Second

Deller Aff. ¶ 3.)  When asked about the nature of Urbanizadora's "interest" described in that

affidavit, Deller responded:

---

[6] The affidavit was later "amended."  (*See* Am. Deller Aff, ECF No. 9-1.)  The amended affidavit does not include
the phrase above stating that Urbanizadora "developed the Shopping Center."

A:      It had an interest that it had paid the money and it had to be reimbursed.

Q:      So it didn't have any interest beyond paying money on behalf of Los Chillos?

A:      Never had an interest.  Never had any interest in it.  Without a doubt, it did not have an interest on it.

Q:      So this is an incorrect statement then?

A:      It's a mis -- I don't know how to say.  When you translate from English to Spanish, if you want to say it's incorrect, then maybe it is incorrect or maybe it's just misunderstood.  Okay?

Q:      Okay.  But as of right now you're stating that Urbanizadora never had an interest in –

A:      It just paid the bills for Los Chillos.

(Deller Dep. 360–61.)

It is not clear from the record whether Urbanizadora paid all of the Los Chillos's bills to DDG, or only some of them.  DDG included in the record three canceled checks from Urbanizadora to DDG dating from between January 18, 2006 and July 13, 2006.  (ECF No. 47-11.)  The checks filed as evidence, however, add up to only a little over $30,000 out of the $260,800.83 in "professional fees and reimbursable expenses" that DDG appears to have been paid for work on the HSL project.  (Deller's Resp. to Interrog. No. 17, ECF No. 47-8.)

In sum, it appears that Deller and his father used Urbanizadora, held privately and wholly by Deller family members, to pay for land purchases, architectural fees, and construction costs related to the Hacienda San Luis.  Deller alternately describes the payments as capital investments in Los Chillos and as "loans," and he notes that for some bills "we probably didn't have enough money in Urbanizadora so maybe we loaned them from somewhere else."  (Deller Dep. 247.)  According to Deller, "[w]e kept [paying the bills and making loans] until we added up the value that we needed to support in purchasing [the Deller family's fifty percent interest in]

11

the company [Los Chillos]." (*Id*.) While Deller suggests that Urbanizadora was reimbursed for these expenses (*id.* at 360, there is no evidence of reimbursement in the record other than his deposition testimony.

### E.  The contract language

After the April 2004 master planning charrette work session, DDG drew up a contract to cover the subsequent phases of the project.  By this time, Deller had "most likely" become the "manager" of Los Chillos (*Id.* at 187), presumably in addition to continuing on as the general manager of Urbanizadora.  Deller negotiated the HSL contract with Lopez.  (*Id.* at 120.)  While Clark "was the brain and the genius behind San Luis" (*id.* at 162), Clark was no longer President of DDG when DDG began work on the project, and Guillermo Lopez had become a partner. (Clark Dep. 147; Deller Dep. 120.)  Thus it was Lopez, with the help of his secretary, who drew up the HSL contract.  (Lopez Dep. 62–63; Clark Dep. 218.)  To do so, Lopez used a DDG form contract that was used at least twice before with Deller, for the two Quicentro projects in late 2003.  ("Standard Form of Agreement . . . for Quicentro," ECF No. 46-10, at 40–56.)

The first page of the HSL contract identified it as an agreement between "the Owner" and "the Architect" for a project described as "Hacienda San Luis."  (HSL Contract, ECF No. 46-10, at 70.)  The form contracts for the Quicentro projects had listed Urbanizadora as the "owner" of the projects and Michel Deller as the "contact."  The HSL contract, however, listed the owner as "Centro Comercial los Chillos," though with the same address as Urbanizadora, and Michel Deller again listed as the point of contact.  (*Id*.)  All of the contracts listed the Architect as DDG. Lopez said that he always believed Deller was the ultimate owner of the project, but that Deller

had asked Lopez to insert Centro Comercial los Chillos as the "Owner" in the contract language. (Lopez Dep. 114–15.)

Deller claims that he never actually read the HSL contract and that he "probably" only looked at the cover page and the page that discussed the fees.  (Deller Dep. 117–19).  As Deller describes it, the only discussions he had with Lopez about the HSL contract were with regard to the price and the schedule.  (*Id*.)  Deller and his partners on the project rejected the first fee that DDG proposed.  As Higgs understood, "Deller said that he had entered into some partnership with an entity that owned the actual land.  And the fee that we had proposed, his partner thought was too high."  (Higgs Dep. 78.)  The fee was lowered after the parties agreed that DDG would limit its work on the project somewhat and allow Deller's architecture firm, MDK, to take on more responsibility for the design documents.  (Lopez Dep. 78–79.)

The final contract called for DDG to work closely with MDK.  DDG was responsible for creating the "schematic design."  (HSL Contract, ECF No. 46-10, at 71.)  But in doing so DDG would analyze plans already put together by MDK and prepare schematic documents "with MDK assistance."  (*Id*.)  DDG and MDK would then "present jointly" to the project "Owner." (*Id.*)  MDK would be responsible for translating the schematic design into architectural drawings.  (Clark Dep. 112.)  According to Deller, "[i]t was impossible for the project to be drawn in Baltimore" because architects in the U.S. were not licensed in Ecuador and did not, for example, know the seismic code in Ecuador.  (Deller Dep. 221.)

After Deller's firms took over the architectural design and construction, DDG remained involved.  The contract called for DDG to design all related signage and graphics, and to create an "internal illuminated model" of the project.  (HSL Contract, ECF No. 46-10, at 72.)  DDG was also to provide assistance throughout the subsequent phases of the project, reviewing

construction documents and consulting on conformance with design drawings during the bidding, value engineering and construction phases. (*Id.*)  The contract listed a figure of $180,000 as the basis of compensation for the schematic design work, including $80,000 for the illuminated model.  The document review was to be provided at an hourly rate, and the signage and graphics fees were listed as "T.B.D."  (*Id.* at 73.)

The HSL contract was originally dated June 21, 2004.  The signature section read as follows:

ACCEPTED:

URBANIZANDORA [*sic*] NACIONES UNIDAS

BY  _____
　　　Michel Deller　　　　TITLE
DATE _____

DEVELOPMENT DESIGN GROUP, INC.

BY  _____
　　　Guillermo Lopez　　　TITLE
DATE _____

(*Id.* at 69.)  Deller signed above his name, and dated his signature July 9, 2004.  (*Id.*; Deller Dep. 120.)  Accompanying the signed copy of the contract, Deller included a fax cover sheet that read, "PLEASE GO FASTER!!  Best regards, Michel Deller."  (ECF No. 46-10, at 68.)[7]  The copy of the contract in the record does not contain Lopez's signature.

Deller avers that all of his "involvement with Design Development Group was entirely in [his] capacity as an officer and agent of Centro Comercial Los Chillos, not in an individual capacity."  (Second Deller Aff. ¶ 9.)  He also avers that Urbanizadora "was not involved in any way in the contract between Design Development Group and Centro Comercial Los Chillos."

---

[7] Deller does not remember having sent the fax with the cover sheet, though he admits that "it's possible that I sent that fax" and that if he had sent the fax, "Please go faster" is "probably" something he would have said.  (Deller Dep. 137, 141.)

14

(*Id*.)  When asked about why Urbanizadora was named in the contract, Clark guessed that it was a mistake:

> [M]y guess is that they would have used, you know, a previous contract and just ripped up the front page and . . . filled in the blanks. . . .  Which is typical of what we typically do. . . .  [I]t wasn't, you know, Urbanizadora.  It was these three guys. . . . Alberto Ferro, Alberto Deller and Juan Carlos were the people that had the land and the investment and the money.

(Clark Dep. 146–47.)  Lopez's deposition response appears to corroborate Clark's theory.  When questioned about the appearance of Urbanizadora in the contract, Lopez recounted how the negotiation had required multiple drafts because Deller had rejected the first fee proposal. (Lopez Dep. 77–79.)   Higgs argues that Deller signed the contract on his own behalf, as indicated by the fax cover page signed by Deller but containing no reference to either of the companies.  (Higgs Dep. 132–33.)


### F.  Location of contract services

The contract included several provisions related to where the work would occur.  Section 2.2 stated that, "[w]hile it is anticipated that all project related meetings will be in [DDG] offices . . . , DDG will attend meetings in Ecuador as requested by the Owner . . . ."  (HSL Contract, ECF No. 46-10, at 72.)  Section 4.1 stated that "[i]t is understood that DDG is providing design services from its offices in the United States" (*id.*), and Section 12.4.2 stated that "[a]ll services provided by Development Design Group, Inc., are performed from . . . Baltimore, Maryland" and that "[a]ll payments should be remitted in full to said office."  (*Id.* at 75.)   In addition, the contract contained a provision titled "Governing Law/Place of Agreement," providing: "This Agreement shall be deemed to have been made and entered into in Baltimore, Maryland."  (*Id.* at 76.)

This kind of language did not appear in every DDG contract or proposal for services.  But it was part of the form contract that was used to create contracts for the two 2003 Quicentro renovation projects.  In addition, there was similar language in two of the contracts used for the earlier San Marino project.  Article 5.1 of each of those documents reads: "It is understood that DDG is an offshore consultant, performing all consulting services from its offices in the United States."  (ECF No. 46-10, at 16, 36.)  The earliest of these San Marino documents is dated January 27, 1999.  (*Id.* at 11.)

Despite the location language of the HSL contract, there is evidence of only one visit by an employee of a Deller entity to DDG's offices during the period of the HSL project.  As discussed above, Deller's only visit to DDG's offices took place in the late 1990's, well before the beginning of the HSL contract.  The only other relevant visit was by Gabriela Ferro, the daughter of Alberto Ferro.  According to Deller, Ms. Ferro had worked as an "intern" for Ekron. (Deller Dep. 404–05).  It is clear from emails produced during discovery that Ms. Ferro had worked on the Los Chillos project, as she had sent documents, including floor plans that had been "produced in Ecuador" via email to Guillermo Lopez at DDG "for their review."  (*Id.* at 406, 414.)  According to Deller, Ms. Ferro "spoke the best English from anybody in the office." (*Id.* at 415.)  So she was sending emails about Los Chillos to DDG "on behalf of the entire office" (*Id.*)

Ms. Ferro visited the DDG offices in Baltimore at some point, possibly while the HSL project was ongoing.  According to Lopez, Ms. Ferro had visited Baltimore with her parents— including Los Chillos co-owner, Alberto Ferro—on their way to her brother's graduation. (Lopez Dep. 153.)  Lopez had dined with Ms. Ferro and her parents before taking Ms. Ferro back for a tour of the DDG office.  (*Id.* at 158.)  According to Lopez, Ms. Ferro had expressed interest

in having input on the San Luis tower while in a meeting in Deller's office in Quito.  (*Id.* at 191.)

In Baltimore, she followed up, showing Lopez "a photograph or a sketch or something" of the

main icon for the tower.  (*Id.* at 189.)  Lopez states in his testimony that he liked her ideas and

suggests that he adopted them as part of the project.  (*Id.*)

Deller states that he did not know that Ms. Ferro had visited DDG's office in Baltimore,

and he questions whether she was still employed with Ekron at the time she visited.  (Deller Dep.

405, 412.)  Lopez does not now know or remember for which entity Ms. Ferro was working,

only that she was working on the HSL project.  (Lopez Dep. 160.)  According to Deller, Ms.

Ferro was only "a junior internee who was learning and with very little capabilities and very little

knowledge, and it was really a favor to have her in the office."  (Deller Dep. 407–08.)  While he

admits that Ms. Ferro sometimes communicated with DDG on behalf of Deller or his entities, he

also suggests that one reason for her contacts was that "afterwards she wanted a

recommendation" from Lopez, because "she wanted to go to an engineering school or

something." (*Id.* at 407.)

While Ms. Ferro was the only employee of a Deller family entity to visit Baltimore

during the course of the HSL project, DDG employees did some amount of work on the HSL

contract in Ecuador.  Of the $260,800.83 in "professional fees and reimbursable expenses" that

Los Chillos paid DDG for work on the HSL project, $55,115.90 was for work performed in

Ecuador.  (Los Chillos's Resp. to Interrog. No. 18, ECF No. 47-10.)  The record contains

evidence that both Lopez and Clark made site visits for work on the project.  Lopez traveled to

Ecuador in October of 2005 to "rework[] some elevations, some facades."  (Lopez Dep. 111–12.)

The authorization for the visit described the reimbursement as based on hourly billing, was sent

to Deller at Urbanizadora, and was signed by Deller.  (ECF No. 46-10, at 78).  And Clark also

visited at least once. (Clark Dep. 177.) There are no further travel documents or billing invoices in the record, but Clark estimates that he would have visited Ecuador between four and ten times for the HSL project alone (*id.* at 170), and Lopez agrees that he attended "multiple meetings" in Ecuador to work on HSL. (Lopez Dep. 72.)

While DDG did perform a portion of its obligations under the contract in Ecuador, it performed a larger share of the work billed on the contract out of its office in Baltimore. Most significantly, DDG employees constructed the internal illuminated model of the Hacienda—which Deller calls the "presentation model"—in their Baltimore office. (Third Deller Aff. ¶ 4; Deller Dep. 207–09.) When Clark and the others were in Ecuador doing the initial design of HSL, they built a "sturdy model" out of Styrofoam and other materials they had brought from Baltimore. (Deller Dep. 209.) After they returned to Baltimore, they created the internal illuminated model that had been agreed to in the HSL contract. (*Id.* at 208–09.) The model required "dozens of employees" working in DDG's offices in Baltimore. (Clark Dep. 159; Lopez Dep. 24–25.)

Clark states that "virtually every project [he] did in the last 15 years at [DDG] had a model." (Clark Dep. 159.) Models provide value to clients in various ways, such as convincing "developers and public officials and leasing people and tenants" of the worth of a plan, "solv[ing] conditions that you didn't recognize when you were just doing a drawing," "saving money from a construction process or mistakes in construction," and assisting "contractors in estimating . . . the cost of the project." (*Id.* at 160–62.) Models were "not nearly as critical" for Deller projects, however, because of the "vertical integration of – of Urbanizadora, meaning they have their own architectural firm, they have their own financing, their own construction company, their own leasing company, their own management company." (*Id.* at 261.) Clark

believes that "Michel probably agreed to have models made because – in a way of kind of throwing us a bone so that, you know, we would continue to come down and work on his projects." (*Id.* at 262.)  As Deller put it, "the work they did in the United States was worthless for us, because I have my own architecture office." (Deller Dep. 97.)  "But [paying for the model] was a way to compromise and a way to subsidize . . . the spectacular creative work that was done while they were in Ecuador." (*Id.* at 97–98.)  Deller believes that at least $110,000 of the total amount Los Chillos paid DDG on the HSL contract was for the work on the model in Baltimore. (*Id.* at 207.)

When asked about Section 4.1 of the contract, Clark claimed that DDG did not provide any "design services" from its office in Baltimore:

Q:    Do you agree that DDG was providing design services from the United States?

A:    Absolutely not.

Q:    No?

A:    No.

Q:    What was DDG providing services, design services, from?  Where, I should say.

A:    All the design was done -- in these different charrettes on these various projects, they were always -- I mean, we always went down there and, you know, worked on the projects down there.  In 15 years of going to Ecuador, before and past, I've never picked up a pencil or pen or anything [in DDG's Baltimore office], other than -- to work on any -- any of the projects ever.  I mean, it just never happened.  I just didn't need to.  It was all done down there, and I still go down there to do all the work.

(Clark Dep. 124–25.)  Clark's testimony is contradicted, however, by his former colleagues. According to Higgs, "99 percent of the services we performed for Deller were performed in Baltimore." (Higgs Dep. 134).  Lopez testified that on all the Ecuador projects about seventy-

five percent of the work done was done in Baltimore.  (Lopez. 173–74).  According to Lopez,

DDG would work in Baltimore on the models, but also on "the design, the storylines, the

facades, the floor patterns."  (*Id.* at 174).

Communications from Ms. Ferro to Lopez appear to give more support to Lopez's

account than to Clark's.  At his deposition, Clark was questioned about the emails that Ms. Ferro

had exchanged with Lopez in August 2004, the month after the HSL contract was signed.  (Clark

Dep. 183–90.)  In those emails, Ms. Ferro appeared to have functioned as a go-between for

Lopez and Deller with regard to the HSL tower logo, sending a draft logo from Ecuador to Lopez

in Baltimore for DDG review.  In response, Lopez had sent comments from a meeting with John

Clark, presumably in Baltimore, to be relayed to Deller.  (*Id.* at 186–87.)[8]  Deller's testimony

also describes this review component of the work in Baltimore, noting that "[after the original

charrette] we would take the plan and draw it in Quito with our own architects, send it up to

Baltimore for any observation.  Then they end up doing the model."  (Deller Dep. 197.)  Thus,

the record supports the conclusion that the work on the presentation model was not the only work

DDG did from Baltimore for the HSL contract.


**G.  The supplemental agreement and alleged breach**

DDG's breach-of-contract allegation stems from the HSL contract supplemental terms

that require "public recognition of DDG as the Design Architect on all publicity, news releases,

marketing brochures, construction documents prepared by others, and awards associated with

this project."  ("Supplemental Terms and Conditions of Agreement Between Owner and

---

[8] From Ms. Ferro's email it could reasonably be inferred that Ms. Ferro was in Ecuador, and Lopez was not, at least at the time the email was sent. Ms. Ferro writes "Thank you so much for the comments on the logo. . . . we have a holiday tomorrow here in Ecuador, so we will be calling you on Monday morning. . . . I haven't been able to talk to Michel about your concerns on the advertisement.  I will try to talk to him today or early Monday morning so we can talk also that on Monday."  (Clark Dep. 186.)

Architect," §12.16.1, ECF No. 46-10, at 77.)  The supplemental terms, which are designated as "Article 12" (*id.* at 74), appear to have been incorporated into the agreement by way of Article 6 of the HSL contract, entitled "Other Terms and Conditions."  (*Id.* at 73.)

Deller's relationship with DDG began to sour in 2006.  At the time, in addition to the HSL project, DDG was also working on a remodeling of the Quicentro shopping center for Urbanizadora.  On March 23, 2006, Lopez communicated with Deller about the charrette for the Quicentro remodel, noting that Lopez himself could not attend because of "[a] large quantity of work," but that John Clark and Pipat Esara would be travelling to complete the charrette.  (ECF No. 46-10, at 79.)  According to Lopez, Higgs just thought that sending three senior designers down to South America was "too much."  (Lopez Dep. 103.)  As Higgs remembered it, this letter marked the moment where "one wheel came off the rail, as it were."  (Higgs Dep. 164–65.)

Deller complained that although his understanding was that DDG would "help us through the whole project," in the "middle of Hacienda construction" Lopez was "instructed by Roy Higgs not to come to Ecuador anymore."  (Deller Dep. 130–31, 143–44.)  Clark continued to work on the project for DDG at this point (*id.* at 131), but by the end of the year Clark had left DDG on unfriendly terms.[9]  Nonetheless, Lopez remembers that DDG "fulfilled [their] commitment" on the HSL contract.  (Lopez Dep. 148.)

The alleged breach occurred at some point after the incident where Lopez had to decline a trip to Ecuador.  Typically, DDG would submit the projects they designed to the International Council of Shopping Centers (ICSC) award competition.  (Higgs Dep. 165.)  The competition

---

[9] Clark stopped working for DDG in 2006 (Clark Dep. 15), and now works on his own as a consultant.  (Lopez Dep. 28.)  In his new capacity, Clark still works with Deller "upon occasion," and he currently has an ongoing project working for Deller on Quicentro.  (Clark Dep. 125–26.)  In fact, Clark noted, he had dined with Deller the Sunday before his deposition, Deller had shown him documents from the suit on one of his visits to Ecuador, and Clark knew at his deposition that the major issue in the case was personal jurisdiction.  (*Id.* at 190–91, 244, 246.)  Clark admits his relationship with Higgs is now "adversarial" (*id.* at 246), as he is unhappy about how Higgs handled Clark's departure from the firm.  (*Id.* at 257, 274.)

honors "outstanding achievement in marketing, design and development of retail properties and retail store design," and is "the most prestigious professional recognition program in the world for the industry of shopping center architectural planning and design." (Am. Compl. ¶¶ 24, 29, ECF No. 14.) DDG began putting together the ICSC application for HSL, but was advised at some point that Deller's office would do it themselves, which was "unusual." (Higgs Dep. 165.)

The San Luis project won a gold medal at the ICSC competition, signifying it as the best in its field. (Am. Compl. ¶ 25.) But the list of award winners did not identify DDG as the firm that designed the project. (*Id*. at ¶ 26.) Rather, Clark and Lopez were listed as designers, with no mention of DDG. (Lopez Dep. 149.) When contacted about the omission, DDG alleges, an ICSC organizer explained that it only recognizes firms authorized by the owner or management company of the winning project, and the San Luis entry application did not identify DDG. (Am. Compl. ¶ 27.)

## H. Procedural history

DDG filed its amended complaint on February 10, 2010. The complaint alleges that Los Chillos breached the HSL contract's public recognition clause when they submitted the San Luis project to the ICSC competition without recognizing DDG as the firm that provided design and planning services. (Am. Compl. ¶¶ 26–28.) The defendants' failure to recognize DDG as the design firm, DDG alleges, caused harm to its business because had defendants properly recognized DDG, the receipt of a gold medal would have attracted business to DDG. (*Id.* at ¶¶ 29–31.) DDG alleges that in addition to Los Chillos, Deller and Urbanizadora are also liable for the breach of contract because Deller "negotiated and executed the Agreement on his own behalf and as a representative of [Los Chillos and Urbanizadora]." (*Id.* at ¶ 11.)

Defendants filed a joint motion to dismiss on March 1, 2010.  On April 13, 2010, defense counsel filed a letter with the court advising it of a breach-of-contract lawsuit Los Chillos had filed in Ecuador against DDG and attaching a copy of the complaint.  (ECF No. 22; Deller Dep. 374 (describing the lawsuit).)  On June 1, 2010, DDG moved to strike the April 13 filing.

The court held an oral argument on the defendants' motion to dismiss on November 16, 2010.  Following the argument, the court concluded that discovery was necessary to determine whether the defendants are subject to personal jurisdiction, and whether Deller and Urbanizadora may be bound by the HSL contract.  All pending motions, including the motion to strike, were therefore denied without prejudice.  (ECF No. 30.)  During the course of the subsequent discovery, depositions were taken of four individuals: Michel Deller, John Clark, Roy Higgs and Guillermo Lopez.  DDG also served the defendants with interrogatories and requests for production of documents.  On June 1, 2011, the defendants filed a second motion to dismiss for lack or jurisdiction, or, in the alternative, for summary judgment.

## II. ANALYSIS

### A.  Personal jurisdiction

A challenge to personal jurisdiction under Fed. R. Civ. P. 12(b)(2) "is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence."  *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).  Where a defendant moves to dismiss for lack of personal jurisdiction based only on the motion, memoranda, and the complaint, the plaintiff need only make a "prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge."  *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009).

"[T]he court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction.'" *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 62 (4th Cir. 1993) (quoting *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir.1989)).[10]

The court must perform a two-step inquiry to determine whether it may exercise specific personal jurisdiction over a defendant.  First, the court must determine if jurisdiction is authorized under the long-arm statute of the forum state.  *See Carefirst*, 334 F.3d at 396. Second, the court must decide whether personal jurisdiction comports with Fourteenth Amendment due process requirements.  *Id.*; *see also World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–92 (1980).  Due process under the Fourteenth Amendment requires that a defendant have "minimum contacts" with the forum state such that the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (internal quotation marks and citation omitted).  "This 'minimum contacts' test is premised on the concept that a corporation [or individual] that enjoys the privilege of conducting business within a state bears the reciprocal obligation of answering to legal proceedings there." *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 293 (4th Cir. 2009) (citing *Int'l Shoe*, 326 U.S. at 319).

DDG contends jurisdiction over the defendants is proper under the portion of the Maryland long-arm statute authorizing personal jurisdiction over a defendant who "directly or by an agent . . . [t]ransacts any business or performs any character of work or service in the State." Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1).  Maryland's long-arm statute is intended to extend personal jurisdiction to the extent permissible under the due process clause.  *See*

---

[10] Eventually, however, at trial or at a pretrial evidentiary hearing, where credibility disputes can be resolved, the plaintiff will need to prove the existence of jurisdiction by a preponderance of the evidence. *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005).

*Androutsos v. Fairfax Hosp.*, 594 A.2d 574, 576 (Md. 1991); *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002).  As a result, the court determines whether the defendants were "[t]ransacting any business" with DDG under Maryland's long arm statute "by simply assessing whether [the defendants] had sufficient 'minimum contacts'" with Maryland "to comport with due process standards."  *CFA Inst.*, 551 F.3d at 293.  Thus, the statutory inquiry merges with the constitutional inquiry.  *Carefirst*, 334 F.3d at 396–97.

The necessary threshold of minimum contacts depends on whether the court exercises personal jurisdiction that is "specific or case-linked" or "general or all-purpose."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, __ U.S. __, 131 S. Ct. 2846, 2851 (2011) ("*Goodyear Dunlop*").  Specific personal jurisdiction "is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction."  *Id.* (internal quotation marks and citation omitted); s*ee also Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 & n.8 (1984).  General personal jurisdiction "requires 'continuous and systematic' contacts with the forum state, such that a defendant may be sued in that state for any reason, regardless of where the relevant conduct occurred."  *CFA Inst.*, 551 F.3d at 292 n.15 (4th Cir. 2009) (citing *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 438, (1952)).  "[T]he threshold level of minimum contacts to confer general jurisdiction is significantly higher than for specific jurisdiction."  *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 623 (4th Cir. 1997).  DDG contends only that the court has specific jurisdiction in this case.

In determining whether the exercise of specific personal jurisdiction comports with due process, the court must consider "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction

would be constitutionally reasonable." *Carefirst*, 334 F.3d at 397 (internal quotation marks and citation omitted).

### 1. Purposeful availment

For specific jurisdiction to be appropriate, the defendant must have engaged in "some act by which the defendant purposefully availed itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Goodyear Dunlop*, __ U.S. __, 131 S. Ct. at 2854 (citing *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)) (alteration omitted).  The purposeful availment requirement is designed to ensure that a defendant is not "haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts," in a forum where he should not have anticipated being sued.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal quotation marks and citations omitted); *see also World-Wide Volkswagen*, 444 U.S. at 297.

"While this requirement is not susceptible of mechanical application, courts have considered various nonexclusive factors in seeking to resolve whether a defendant has engaged in such purposeful availment." *Consulting Engineers*, 561 F.3d at 278.  A court may consider (1) whether the defendant maintains offices or agents or owns property in the forum state; (2) whether the defendant reached into the forum state to solicit or initiate business; (3) whether the defendant deliberately engaged in significant business activities in the forum state; (4) whether the parties contractually agreed that the law of the forum state would govern disputes; (5) whether the defendant made in-person contact with a resident of the forum state regarding the business relationship; (6) the nature, quality and extent of the parties' communications about the business being transacted; and (7) whether the performance of the contract was to occur within

the forum.  *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009)

(internal citations omitted).

It appears that DDG has provided sufficient evidence of purposeful availment by all three

defendants.  None of the defendants maintained offices or own property in Maryland.  But, for

the purpose of this jurisdictional inquiry, the court assumes that the defendants were parties to a

contract with a firm that was based in Baltimore.[11]  Although an out-of-state party's contract in

the forum state will not automatically establish jurisdiction, the surrounding facts, negotiations,

contract terms, location of payment, and the parties' course of dealing may do so.  *See Burger*

*King*, 471 U.S. at 478–79.  The ultimate question is whether the contract had a "substantial

connection" to the forum state.  *Id.* at 479.  Here, the court must give significant weight to the

express terms of the HSL contract and to the performance of a substantial portion of the

contractual obligations in Maryland, as well as to the defendants' initiation of the HSL project.

In addition, both Deller and Urbanizadora were involved in nearly a decade of communications

and transactions with DDG, culminating in the contract at issue.  While it is a close question, the

defendants should be considered to have purposefully availed themselves of the privilege of

conducting business in Maryland.

The physical presence of defendants or their agents in the forum state weighs in favor of

finding purposeful availment.  *See, e.g., CFA Inst.*, 551 F.3d at 289–90, 295 (finding jurisdiction

where defendants "sent representatives to [the forum state] to meet with" the plaintiffs);

*Hirschkop & Grad, P.C. v. Robinson*, 757 F.2d 1499, 1503 (4th Cir. 1985) (exercising

---

[11] As discussed below, the court holds that DDG has not met its burden of proving that Deller and Urbanizadora are in fact parties to the contract.  However, where a case may be dismissed on an issue relating to the merits of the claim, such a dismissal ordinarily is "improper without resolving threshold issues of jurisdiction, including personal jurisdiction."  *Sucampo Pharms., Inc. v. Astellas Pharms, Inc.*, 471 F.3d 544, 548 (4th Cir. 2006) (citing *Ruhrgas AG v. Marathon Oil*, 526 U.S. 574, 583 (1999)).  Thus, the court proceeds with the jurisdictional analysis first and does so under the assumption that Deller and Urbanizadora are, as alleged, parties to the contract.

jurisdiction over defendants who traveled to the forum state to discussed the retainer agreements and fees at issue in the suit).

Here, Deller's visit to Baltimore after the San Marino project is a factor suggesting purposeful availment by both Deller and Urbanizadora.  Urbanizadora argues that this visit cannot be attributable to the company because the San Marino project was owned by INMI, not Urbanizadora.  (ECF No. 48, at 5.)  Deller, however, admits that Urbanizadora had a role in "promoting" the San Marino project (Deller Dep. 43), and Deller was Urbanizadora's general manager at the time.[12]  Thus, the visit should be considered a contact by which both Deller and Urbanizadora transacted business in and purposefully availed themselves of the State of Maryland.

Whether Deller's visit is relevant to jurisdiction over Los Chillos is a more complicated question.  Los Chillos did not exist at the time, so Deller could not have been acting as an agent for the company.  Nonetheless, as discussed below, there is some support for attributing the contacts of a promoter to the corporation that later ratifies his or her actions.  To the extent that Los Chillos used Deller's knowledge of DDG's Baltimore operations as part of the basis for signing the HSL contract, Deller's visit could be interpreted as ratified by Los Chillos and therefore relevant to the question of whether Los Chillos purposefully availed itself of the protections of the State of Maryland.  Ultimately, however, such a determination is not necessary, as the court finds that the existence of an in-person visit by defendants to the forum state is not a prerequisite to jurisdiction in this case.

---

[12] The defendants also argue that this visit was irrelevant to jurisdiction over the HSL contract conflict because the visit came years before the HSL concept was born.  This concern, however, is properly addressed in the second prong of the test for specific jurisdiction, the analysis of whether the breach "arises" from the minimum contacts.  In any case, as discussed below, the court finds that the initiation of the HSL contract, the contract language and HSL contract course of dealing are sufficient contacts to meet the purposeful availment prong of the specific jurisdiction test.  Thus, the court need not determine whether or not the HSL arises out of this earlier Deller visit to Baltimore.

The other two visits in the record do not suggest purposeful availment. Deller's second visit appears to have been social in nature and occurred after DDG and the defendants had ceased working with each other. Ms. Ferro's visit to Baltimore, which represents the only visit in the record by an alleged agent of the defendants during the time of the HSL project, does not appear to have been authorized by any of the defendants and therefore cannot be considered as a contact in the purposeful availment analysis. The actions of an agent may only be attributed to the principal for jurisdictional purposes where the agent has acted with authority granted by the principal. *See ASCO Healthcare, Inc. v. Heart of Texas Health care & Rehab., Inc.*, 540 F. Supp. 2d 634, 642 & n.12 (D. Md. 2008); *Int'l Shoe*, 326 U.S. at 316 (holding that the sufficiency of a corporation's contacts with a forum state are to be determined by reference to "activities carried on in its behalf by those who are authorized to act for it"). While Ms. Ferro may have been working for Los Chillos at the time of her visit,[13] Deller denies having any knowledge or previous authorization of her visit, and there is no evidence Los Chillos later ratified any actions taken by her on her visit.

The existence of an in-person visit by the defendant or an agent, however, is relevant but not essential for a finding of purposeful availment. "The Supreme Court has made it clear that the lack of physical presence is not dispositive: '[j]urisdiction . . . may not be avoided merely because the defendant did not *physically* enter the forum State.'" *English & Smith v. Metzger*, 901 F.2d 36, 39 (4th Cir. 1990) (emphasis in original) (quoting *Burger King Corp.*, 471 U.S. at 476). As the *Burger King* court explained,

> [a]lthough territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of

---

[13] According to Deller, Ms. Ferro had worked as an intern for Ekron, but it is clear that Ms. Ferro also worked as a go-between on design-related issues for Deller himself on the HSL project—at the time Deller was, it seems, general manager of both Urbanizadora and Los Chillos.

business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted.

471 U.S. at 476 (listing cases).

The "strongest factor" in determining purposeful availment is "whether the defendant initiated the business relationship in some way." *Giannaris v. Cheng*, 219 F. Supp. 2d 687, 692 (D. Md. 2002) (internal quotation marks and citation omitted).[14]  In analyzing this factor, both the beginning of the overall business relationship and the beginning of the specific project at issue are relevant. *See Nueva Eng'g, Inc. v. Accurate Elecs., Inc.*, 628 F. Supp. 953, 956 (D. Md. 1986).  In *Nueva Engineering*, the court performed an exhaustive review of jurisdiction in Fourth Circuit contract cases, focusing on the question of how the relationship was initiated.  The court found personal jurisdiction based on the contract, noting that "[a]lthough [the defendant] did not initiate its business relationship" with the plaintiff, the defendant's President "took steps preparatory to initiating a new phase of that relationship." *Id.*

In the case at hand, the evidence of which party initiated the original meeting in Las Vegas is inconclusive.  The defendants characterize that meeting as "at the insistence of owners of another shopping center who had worked with Mr. Clark previously" and that "Mr. Clark is the one who asked for the opportunity to perform work in South America."  (ECF No. 48, at 11.) And, it may be relevant that Clark was at the conference in Las Vegas for marketing purposes in the first place. *See Consulting Engineers*, 561 F.3d at 280 n.7.  Nonetheless, it is not disputed that it was Deller and the third parties that were having the original discussion, and that Clark only later was approached and given the opportunity to meet Deller.  As DDG describes it, and

---

[14] While the question of who initiated the relationship may be the "strongest factor," it is not in itself dispositive of purposeful availment. *See Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 216 (4th Cir. 2001) ("A prospective defendant need not initiate the relevant 'minimum contacts' to be regarded as purposefully availing himself of the privileges of conducting activity in the forum state.").

the court agrees, Deller initiated the relationship with DDG in the first place when he "authorized third parties to introduce him to former DDG employee John Clark." (ECF No. 47, at 11.)

The defendants also argue that the Las Vegas location of the original meeting means that "any requests that were made to DDG, were, therefore, not directed to Maryland." (ECF No. 48, at 10–11.) While there may be some merit to this claim for jurisdiction over any conflict arising directly from that first meeting, the argument is much weaker when applied to the HSL contract signed over five years later. In between, Deller paid for dozens of trips for DDG employees to travel from Baltimore to Ecuador, and travelled himself to DDG's Baltimore office. Thus, at some point, the location of the first meeting loses relevance.[15]

More relevant, however, is the question of how the HSL project itself was initiated. As Deller describes the initiation of the project, first Alberto Ferro "proposed" to Deller that they "co-participate in the development of Hacienda San Luis." (Deller Dep. 106–07.) Subsequently, "[w]e took John to see the site." (*Id.* at 107.) Thus, like the original meeting in Las Vegas, Clark was approached about a project after a discussion of the project had already begun between Deller and a third party. The town center design for the HSL site was Clark's idea. The court, however, gives little weight to this fact given that Deller had specifically asked Clark to come up with "new ideas" for Deller-related projects. (Clark Dep. 85.)

While it is apparent to the court that Ferro and Deller initiated the HSL contract with DDG, it remains to be determined whether their actions can be attributed to Urbanizadora and Los Chillos. If Ferro or Deller were operating as agents for either company at the time, their actions could be "attributed to the principal for jurisdictional purposes." *Johansson Corp. v. Bowness Constr. Co.*, 304 F. Supp. 2d 701, 706 (D. Md. 2004) (citing *Giannaris*, 219 F. Supp.

---

[15] *Burger King* provides a relevant comparison. In that case, the defendant first initiated contact with the defendant in Michigan, 471 U.S. at 466, but that did not dissuade the Court from finding jurisdiction proper in the forum state of Florida.

2d at 693).  The Maryland long-arm statute on which DDG relies explicitly extends jurisdiction over persons who transact business in the State "by an agent."  Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1).

The record suggests Deller was acting as an agent for Urbanizadora, at least, when he showed the HSL land to Clark.  At the time, Deller was the general manager of Urbanizadora (Second Deller Aff. ¶ 1), and the visit occurred while Clark and Lopez were in Ecuador to work on the remodeling of Quicentro, a project owned by Urbanizadora.  (Deller Dep. 155.)  There is no evidence in the record to suggest Deller somehow took off his Urbanizadora hat in the middle of Clark's visit.  Furthermore, as Urbanizadora explained in its interrogatory answers, Urbanizadora was "the company that developed the preliminary idea for the [HSL] Shopping Center prior to the formation of Centro Commercial [*sic*] Los Chillos."  (Urbanizadora's Resp. to Interrog. No. 13.)  Thus, it appears that Deller was acting on behalf of Urbanizadora when he invited Clark to see the HSL land.

Again, whether Deller or Ferro's actions in initiating the HSL deal can be attributed to Los Chillos is more complicated.  It is not clear whether Los Chillos was in fact legally in existence at the time of the visit.  The first legal filing to create Los Chillos appears to have been made on October 30, 2003, and the legal existence appears to have begun on December 20, 2003.  (*See* Los Chillos Corporate Registration Documents, ECF No. 47-3, at 3, 5.)  Neither Clark, Deller nor Lopez were able to give a specific date when the first visit to the HSL land took place, though Urbanizadora's interrogatory answers state that Urbanizadora developed the preliminary idea "prior to the formation of . . . Los Chillos."  (Urbanizadora's Resp. to Interrog. No. 13.)

To the extent that Ferro's approach to Deller and Deller's approach to Clark took place before Los Chillos was in fact formed, their actions can best be interpreted as those of promoters

of Los Chillos.  *See Crosse v. Callis*, 282 A.2d 86, 89 (Md. 1971) (adopting the definition of promoter that "includes those who undertake to form a corporation and to procure for it the rights, instrumentalities and capital by which it is to carry out the purposes set forth in its charter").  While the caselaw is "sparse" on the effect of pre-incorporation promoter contacts on personal jurisdiction of a corporation, the cases that have addressed the question "stand for the proposition that pre-incorporation activities of promoters that are later ratified by the corporation may be considered in evaluating personal jurisdiction." *Burlington Indus., Inc. v. Yanoor Corp.*, 178 F. Supp. 2d 562, 568 (M.D.N.C. 2001); *see also Rees v. Mosaic Techs., Inc.*, 742 F.2d 765, 768–69 (3d Cir. 1984) (analogizing that if a corporation may be liable for actions of a promoter, the promoter's contacts should be relevant to the determination of jurisdiction); *Chase v. Pan–Pacific Broad., Inc.*, 617 F. Supp. 1414, 1424 (D.D.C. 1985) (citing *Rees*, 742 F.2d at 768–69). *Cf. Mitrano v. Hawes*, 377 F.3d 402, 407 (4th Cir. 2004) ("Whether or not an agent is initially authorized to act on behalf of a principal, the agent's actions may be attributed to the principal, for purposes of personal jurisdiction, if the principal later ratifies the agent's conduct." (quoting *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 55 (1st Cir.2002))); *ASCO*, 540 F. Supp. 2d at 641 n.10 (suggesting that if one company can be described as "impliedly adopting" another's contracts, then it may be proper to attribute the original contracting party's contacts to the new company); *Burger King*, 471 U.S. at 479 n.22 (stating that commercial activities performed on a party's behalf "may sometimes be ascribed to the party" but not "resolv[ing] the permissible bounds of such attribution").

Upon its formation, Los Chillos ratified the actions taken by Deller and Ferro by binding itself to the contract with DDG and by allegedly reimbursing Urbanizadora for its payments for all of DDG's HSL-related activities prior to signing the HSL contract.  (Deller Dep. 360–61.)

*Cf. Burlington Indus.*, 178 F. Supp. 2d at 568 (finding that a corporation ratified the pre-incorporation actions of promoter where the actions "led to the negotiation and subsequent execution" of the contract that was signed post-incorporation); *Rees*, 742 F.2d at 767, 769 (finding that a corporation later ratified a pre-incorporation contract by submitting a check for pre-incorporation services); *Progressive Cas. Ins. Co. v. Ehrhardt*, 518 A.2d 151, 156 (Md. App. 1986) (holding ratification may be inferred when the principal, through "words, conduct, or silence," indicates its desire to affirm the unauthorized act).   Accordingly, Los Chillos—like Deller and Urbanizadora—should be considered to have initiated the business relationships that became the HSL project, at least for the purpose of considering the purposeful availment prong of the personal jurisdiction test.

The language of the HSL contract itself also suggests the defendants knowingly conducted business in Maryland and invoked the benefits and protections of its laws.   As an initial matter, the court agrees with DDG that the contract should be interpreted as containing a choice-of-law clause.   The clause in the HSL contract is not as unambiguous as the clause analyzed by the Supreme Court in *Burger King*,[16] but it still should be interpreted as a choice-of-law clause.   Under the traditional choice-of-law rule of *lex loci contractus*, "courts apply the substantive law of the state where the contract was made." 16 Am. Jur. 2d Conflict of Laws § 85 (1998).[17]   Thus, by noting that the HSL contract was "made and entered into in Baltimore,

---

[16] There, the provision stated that the contract "shall be deemed made and entered into in the State of Florida and shall be governed and construed under and in accordance with the laws of the State of Florida. . . ." *Burger King*, 471 U.S. at 481 (emphasis added).   The clause here is more vague, as the only reference to choice of law is the title of the clause, "Governing Law/Place of Agreement," which itself is vague.   Below that, the only additional language reads: "[t]his Agreement shall be deemed to have been made and entered into in Baltimore, Maryland."   (HSL Contract, § 12.14, ECF No. 46-10, at 76.)

[17] While *lex loci contractus* continues to control under Maryland choice-of-law rules, *U.S. Life Ins. Co. in City of New York v. Wilson*, 18 A.3d 110, 116 (Md. App. 2011), the rule has in many cases been abandoned for the "significant relationship rule." 16 Am. Jur. 2d Conflict of Laws § 83 (1998).   Nonetheless, the existence of the traditional rule helps to explain how the more limited language of the contractual provision at issue here was intended to be interpreted as a choice-of-law clause.

Maryland," the "Governing Law" subsection reads as a choice-of-law clause.[18]  As with the other factors discussed above, the inclusion of the clause, while relevant, is not dispositive of jurisdiction.  *Burger King*, 471 U.S. at 481–82.  Rather, it is "one factor that a court may take into account in determining whether the exercise of personal jurisdiction is justified, but it is no more than that."  *Consulting Engineers*, 561 F.3d at 281.

In addition to the choice-of-law provision, the contract also contains three other provisions anticipating that services under the contract would be rendered in Maryland and that payment for the services should be remitted to the DDG office in Maryland. (HSL Contract §§ 2.2, 4.1, & 12.4.2, ECF No. 46-10, at 72, 75.)  And, as the defendants admit, a significant portion of the services under the contract were in fact performed in Maryland.  While the defendants, and Clark, downplay the value and the extent of the work performed from Baltimore, the court cannot ignore defendants' admission that only $55,115.90 of the $260,800.83 that Los Chillos paid DDG for work on the HSL project was for work performed in Ecuador.  (Deller's Resp. to Interrog. No. 13; Los Chillos's Resp. to Interrog. No. 18.)

Clark claims DDG did not provide any "design services" from its office in Baltimore (Clark Dep. 124–25), but this statement cannot be given significant weight.  For one, the communications from Ms. Ferro reviewed during Clark's deposition appear to contradict this statement.  As discussed above, Ms. Ferro appeared to have functioned as a go-between for Lopez and Deller with regard to the HSL tower logo, sending a draft logo from Ecuador to Lopez in Baltimore for DDG review.  The review appeared to have happened in a meeting with Clark and Lopez in Baltimore.  Testimony by Higgs and Lopez—and even Deller—describe services

---

[18] The court also notes that the contract was in English, a factor that certainly is not dispositive, but that should serve as some indicator of whether the parties could have expected disputes to be litigated in the United States—at least where the other option is a non-English speaking country. *See Foster v. Arletty 3 Sarl*, 278 F.3d 409, 415 (4th Cir. 2002) (finding no jurisdiction over French defendants because, among many other reasons, "most of the contracts are written in French").

provided in Baltimore.  In addition, the court notes, Clark now works for Deller directly instead of for DDG, says that his relationship with DDG's CEO is "adversarial," and admits to having been shown lawsuit materials in Deller's office, having met with Deller the Sunday before his deposition, and knowing that the issue to be determined in the suit is personal jurisdiction. (Clark Dep. 125–26, 190–91, 246.)

In addition to noting Clark's testimony, defendants argue that all of the "significant" services DDG provided to the defendants were provided in Ecuador.  The core contention is that Deller did not in fact need the internal illuminated model, which accounted for much of the billable work done by DDG in Baltimore.  To support this distinction, the defendants cite *Johansson*, 304 F. Supp. 2d at 703, 706–07, and *Joseph M. Coleman & Assocs, Ltd. v. Colonial Metals*, 887 F. Supp. 116, 117–18 (D. Md. 1995).  In *Johansson*, the plaintiff alleged that "approximately 85 percent of the company's hours spent on the project, representing at least two-thirds of the value of the subcontract, were spent in Maryland."  304 F. Supp. 2d at 706–07. In *Coleman*, the plaintiffs had done "the majority of work under the consulting agreement in Maryland."  887 F. Supp. at 119.  Nonetheless, in both cases, the courts declined to exercise personal jurisdiction.

These two cases, however, are distinguishable.  In neither *Johansson* nor *Coleman* did the court find, as the court has here, that the defendants initiated the business relationship.  And, in neither case was the choice of law contested.  In *Coleman*, the plaintiff did not dispute that Pennsylvania law, not Maryland law, applied to the interpretation of the contract.  887 F. Supp. at 119.  In *Johansson*, the contract at issue contained a choice-of-law clause that opted away from the forum state, fixing North Carolina law as the governing law, not Maryland law.  304 F. Supp. 2d at 706–07.  Furthermore, the *Johansson* contract listed Moore County, North Carolina,

as the "location" of the contract.  *Id.* at 707.  Thus, the *Johansson* court ultimately concluded that the defendant corporation had "never reached out beyond the state of North Carolina" and had only "reluctantly" been drawn into the "short-term relationship" with the Maryland corporation. *Id.* at 708–09.

The facts in the instant case are closer to those in *English* and to *Burger King*.  In *English*, neither the defendant nor an agent ever visited Virginia, the forum state.  But the defendant had initiated the relationship with the plaintiff, "knowing that [the plaintiff] was a Virginia lawyer who likely would do the requested work in Virginia."  901 F.2d at 39.  The plaintiff performed all of his work in Virginia, though the work would be used in a court case in California and the fee paid based on the outcome of the California case.  *Id.* at 37.  The Fourth Circuit found personal jurisdiction was constitutional in Virginia, notwithstanding the fact that contractual obligations had been carried out by the defendant in California and the lack of a physical visit to Virginia by the defendant.  The panel noted, with some relevance to the defendants' arguments here, that "*[t]he relevant question is not where the contacts predominate, but only whether enough minimum contacts exist that the district court's assumption of specific jurisdiction satisfied due process.*"  *Id.* at 39 (emphasis added).

Similarly, in *Burger King*, the defendant had never traveled to Florida, the forum state, and the relationship was initiated entirely outside of the forum state, by an application for a franchise made to Burger King's office in Michigan, not Florida.  471 U.S. at 466.  But, as here, the defendant initiated the relationship, signed a contract that included a forum state choice-of-law clause, and "[t]he contract documents themselves emphasize that [the plaintiff's] operations are conducted and supervised from the [forum state] headquarters, that all relevant notices and payments must be sent there, and that the agreements were made in and enforced from [the

37

forum state.]"  *Id.* at 480.  As in *Burger King*, the HSL contract was not just a one-time purchase of good or services, but envisioned a multi-year relationship between the parties.  Where, as here, a defendant has "created 'continuing obligations' between himself and residents of the forum . . . he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by 'the benefits and protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well."  *Id.* at 475–76 (quoting *Travelers Health Assn. v. Virginia,* 339 U.S. 643, 648 (1950)).

In sum, the court finds that Deller and Ferro initiated the HSL contract while Deller was acting as an agent for Urbanizadora and both men were acting as promoters for Los Chillos.  Los Chillos later ratified Deller's and Ferro's actions through the HSL contract and the alleged reimbursement of Urbanizadora for HSL-related expenses.  Thus all three defendants should be considered to have initiated the relevant relationship with DDG.  This fact, in combination with the Maryland choice-of-law provision and the extensive notice in the contract that services would be performed from DDG's Maryland office, suggest that all three defendants purposefully directed their actions toward the State of Maryland.  Furthermore, as indicated by the contract, a majority of the contractual obligations carried out by DDG were in fact carried out in Maryland, with the knowledge and assent of the defendants.  It is thus apparent that the HSL contract had a substantial connection to Maryland, and therefore—to the extent they are all parties to the contract—all three defendants purposefully availed themselves of the benefits and protections of its Maryland's laws.[19]

---

[19] In so concluding, I need not rely on the long relationship between Deller, Urbanizadora, and DDG that preceded the HSL contract, including Deller's visit to DDG's Baltimore office.  As discussed *supra,* note 18, the HSL contract alone—including the negotiations leading up to it, the contract language, and the course of dealing— provides the minimum contacts to demonstrate purposeful availment on the part of Los Chillos.  "So long as it

### 2. Arising out of

The second prong of the test for specific jurisdiction requires that the defendants' contacts with the forum state form the basis of the suit. *Consulting Engineers Corp.*, 561 F.3d at 278-79. Because the scope of a court's jurisdiction in a specific jurisdiction case is "confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction," *Goodyear Dunlop*, 131 S. Ct. at 2851 (internal quotation marks and citation omitted), a plaintiff must also show that the suit "arises out of or relates to the defendant's contacts with the forum." *Id.* at 2853 (quoting *Helicopteros*, 466 U.S. at 414, n.8) (alterations omitted).

DDG argues that because the contract was deemed to have been made and entered into in Maryland, and defendants are alleged to have breached the contract, the claim arises out of defendants' contacts with Maryland. Defendants argue that even if the contract and Deller's actions were to constitute purposeful availment, DDG's claim does not arise out of those contacts because the alleged breach—*i.e.*, defendants' alleged failure to recognize DDG as the design architect—occurred in Ecuador.

"Unfortunately, the Supreme Court has not yet explained the scope of [the [arising out of] requirement." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 318 (3d Cir. 2007). The Third Circuit recently described the three approaches that "predominate" among the state and lower federal courts: the most restrictive "'proximate cause' or 'substantive relevance' test," the second, more relaxed "but-for" causation test, and the least restrictive "'substantial connection' or 'discernible relationship'" test. *O'Connor*, 496 F.3d at 318–19.

---

creates a 'substantial connection' with the forum, even a single act can support jurisdiction." *Burger King*, 471 U.S. at 476 n.18 (quoting *McGee v. Intn'l Life Ins. Co*., 355 U.S. 220, 223 (1957)).

While it has not expressly adopted one of these approaches, the Fourth Circuit appeared to utilize a more relaxed "but-for" causation test in *CFA Institute*. In that case, the panel concluded that the breach-of-contract suit arose out of the defendant's "Virginia-related business transactions" because a meeting in Virginia attended by representatives of the defendant was "the genesis of this dispute." *CFA Inst.*, 551 F.3d at 295.

If a breach-of-contract claim may be said to arise out of a meeting that leads to a contract, it follows that a contract itself is also the "genesis" of a breach-of-contract dispute and therefore may anchor the "arising out of" prong for the purpose of specific jurisdiction. *Accord Hardnett v. Duquesne Univ.*, 897 F. Supp. 920, 924 (D. Md. 1995) (noting breach-of-contract claims may be considered to have arisen out of the contract itself); *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 31 (2d Cir. 1996) (holding that a "breach of contract claim 'arises out of' both [the breach] and the . . . agreement itself"). *Cf. Production Group Intern., Inc. v. Goldman*, 337 F. Supp. 2d 788, 794 (E.D. Va. 2004) (holding that, in a breach-of-contract action, the arising from prong may be anchored by "any contract performance activity in the forum even if not directly related to the alleged breach"); *Hahn v. Vermont Law Sch.*, 698 F.2d 48, 51 (1st Cir. 1983) (holding that a breach-of-contract action arose from the business transactions in the forum state, even though the act of breach occurred in another state). Thus, the court here concludes that DDG's breach-of-contract claim arises out of the HSL contract that has been found to have a "substantial connection" to Maryland, even if the breach of the contract occurred in Ecuador.[20]

---

[20] Because the negotiations, language and course of dealing of the HSL contract are sufficient to constitute purposeful availment, the court need not express any opinion as to whether the breach of contract could be considered to arise out of the earlier contacts between Deller, Urbanizadora, and DDG, such as Deller's late 1990's visit to DDG's Baltimore office.

### 3.   Constitutional reasonableness

The final prong of the specific jurisdiction test requires that the exercise of personal jurisdiction otherwise "comport[s] with 'fair play and substantial justice,'" *Burger King*, 471 U.S. at 486, and therefore is "constitutionally reasonable." *Consulting Engineers*, 561 F.3d at 279.   Under this prong, the court may consider various "additional factors to ensure the appropriateness of the forum," including the following:

> (1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies.

*Consulting Engineers*, 561 F.3d at 279 (citing *Burger King*, 471 U.S. at 477).

The Supreme Court has made clear that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi Metal Indus. v. Superior Court of Cal.*, 480 U.S. 102, 115 (1987) (quotation marks and citation omitted).   In *Asahi*, a majority of the justices agreed that

> a court [must] consider the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction by the [United States forum].   The procedural and substantive interests of other nations in a state court's assertion of jurisdiction over an alien defendant will differ from case to case.   In every case, however, those interests, as well as the Federal Government's interest in its foreign relations policies, will be best served by a careful inquiry into the reasonableness of the assertion of jurisdiction in the particular case, and an unwillingness to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State.

480 U.S. at 115.   Thus, the Fourth Circuit has concluded, "[the reasonableness] factors apply with particular force in actions against foreign national defendants." *Ellicot Mach. Corp. v. John Holland Party Ltd.*, 995 F.2d 474, 469 (4th Cir. 1993) (concluding jurisdiction over an

Australian company engaged in a contract dispute with a Maryland company was not reasonable).

Nonetheless, the Fourth Circuit found jurisdiction appropriate over a foreign defendant in in *CFA Institute*, in a situation similar to the one here. The panel there held that the exercise of personal jurisdiction over an Indian defendant was reasonable because (1) the defendant had hired local counsel, (2) it was reasonably foreseeable that the defendant could be subject to suit in Virginia based on its dealings with the Virginia plaintiff, (3) Virginia has a "valid interest in the resolution of the grievances of its citizens and business, particularly when they potentially involve issues of Virginia law," and (4) the plaintiff had "a valid and substantial interest in having its legal rights recognized and vindicated." 551 F.3d at 296–97.

Defendants here note that the reasonableness prong is aimed at determining whether litigation in the forum state is "so gravely difficult and inconvenient as to place the defendant at a severe disadvantage in comparison to his opponent." *Id.* at 296 (internal quotation marks and citation omitted). They argue that exercising personal jurisdiction is therefore unreasonable because Maryland is nearly 3,000 miles from Ecuador, defendants' native language is not English, and Ecuador's judicial system is different from that of the United States.

While the court recognizes that, for defendants who are residents of Ecuador, defending a lawsuit in Maryland will be "without doubt, inconvenient," it is also clear that "the inconvenience [will not be] so grave as to offend constitutional due process principles." *Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 217–218 (4th Cir. 2001). Defendant Deller, who has acted an agent and representative of Urbanizadora and Los Chillos for the purpose of this litigation so far, and who is the primary witness in this case, travels often to the United States. He visits family in the United States and is the director

and beneficiary of several trusts that manage real estate in multiple U.S. states. The defendants have hired local counsel already and engaged in jurisdictional discovery, and the court ordered that the parties split Deller's travel costs for his deposition. (ECF No. 39.) Deller is fluent in English, as demonstrated by the 495 pages of his deposition testimony in this case, at a deposition taken without a translator, and by the college degree he attained in this country.

"Furthermore, the inequity of being haled into a foreign forum is mitigated if it was reasonably foreseeable that the defendant could be subject to suit there." *CFA Inst.*, 551 F.3d at 296 (citing *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977) (Stevens, J., concurring in judgment)). *But cf. World-Wide Volkswagen*, 444 U.S. at 295 (observing that "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause"). And, for all of the reasons outlined above, it was reasonably foreseeable to the defendants that DDG might institute a lawsuit in Maryland. Urbanizadora and Los Chillos operated through Deller, who had intimate knowledge of DDG operations in Baltimore. Multiple previous contracts between DDG and Deller entities had contained language similar to the HSL contract. Deller actively negotiated the pricing of the HSL contract, including the substantial work to be done in Baltimore on the illuminated model and the design and construction review processes. A breach of the contract would cause "foreseeable injuries to the corporation in [its home state]." *Burger King*, 471 U.S. at 480. There were essentially two possible places that suit could be brought in the event of a breach of contract, Maryland or Ecuador, and all of the signs in the contract pointed to Maryland.[21]

In assessing the interests of the forum state, Maryland "has a valid interest in the resolution of the grievances of its citizens and businesses, particularly when they potentially involve issues of [Maryland] law." *CFA Inst.*, 551 F.3d at 297; *see also McGee*, 355 U.S. at 223

---

[21] The court, of course, expresses no opinion as to whether it would also be proper to hear the case in Ecuador.

(recognizing a forum state's "manifest interest in providing effective means of redress for its residents . . ."). While "[t]his concern diminishes . . . as Maryland's citizens seek their fortune away from home," *Ellicott*, 995 F.2d at 479, the state interest remains significant.

Finally, DDG "possesses a valid and substantial interest in having its legal rights recognized and vindicated." *CFA Inst.*, 551 F.3d at 297. To the extent that a court in Maryland is the only forum in the United States in which this case can be heard, DDG's interest here is elevated. It will be equally as inconvenient for DDG to travel to Ecuador as it will for the defendants to travel to Maryland. That said, it is not even clear from the record that the case can or will be heard in Ecuador, and thus that there is any other forum where DDG's claims can be heard.[22]

Weighing all of the above factors, the court concludes that DDG has met its burden of showing, under a pretrial standard, that it is constitutionally reasonable for this court to exercise specific personal jurisdiction over the defendants in the case. Accordingly, the defendants' motions to dismiss for lack of personal jurisdiction now must be denied.

### B.  Motion for summary judgment by Deller and UNU

While Los Chillos does not dispute that it was a party to the HSL contract, Deller and Urbanizadora have moved for summary judgment on the grounds that they were not parties to the HSL contract and therefore cannot be liable for its breach. Prior to discovery, DDG argued that "the Contract is not clear on its face that Defendants Deller and Urbanizandora [sic] were not meant to be parties." (ECF No. 20-1, at 13.) Now, after discovery directed specifically to

---

[22] While the court is aware that Los Chillos filed suit against DDG in Ecuador on March 23, 2010, DDG has raised questions about the suit's viability, including whether the suit is barred by the statute of limitations. There is no evidence in the record to confirm whether the suit has survived relevant threshold rulings.

this question, Deller and Urbanizadora argue that the court should grant summary judgment and dismiss them as defendants in the case.

Federal Rule of Civil Procedure 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *See id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

DDG acknowledges that neither Deller nor Urbanizadora "were definitively parties to the Contract." (ECF No. 20-1, at 14.) Nonetheless, it alleges that Deller and Urbanizadora may also

be held liable for breach of contract because when Deller executed the agreement, he was acting not only on Los Chillos's behalf, but also on behalf of Urbanizadora and himself.  (Am. Compl. ¶ 11.)  Among other arguments, DDG contends that the appearance of Urbanizadora on the signature page creates an unrebutted presumption that Urbanizadora was a party to the contract. (ECF No. 47, at 24.)  Even if Deller and Urbanizadora were not original parties to the contract, DDG argues, they "at least adopted the contract subsequent to its execution."  (ECF No. 47, at 23, 25.)  The defendants argue that there can be no genuine dispute of fact that Deller signed the contract as an agent on behalf of Los Chillos and that the insertion of Urbanizadora on the contract resulted from a "clerical error" by DDG.  (ECF No. 46-1, at 14–15.)

### 1.  Deller

The court agrees with the defendants that Deller signed the HSL contract as an agent for Los Chillos, and not in his individual capacity.  It is undisputed that the HSL contract identifies Los Chillos as the "owner" of the HSL project and that Deller is listed as the "contact" for Los Chillos.  The public recognition section of the contract—the section allegedly breached by the defendants—lists the "owner" as the obligor.  It is also undisputed that Deller advised both Clark and Lopez prior to the drafting of the contract that Los Chillos would be the owner of the project.

Deller testified that at the time he negotiated the HSL contract he was "most likely" the general manager of Los Chillos.  If indeed he was the general manager, then Maryland law presumes him to be an agent of Los Chillos with the authority to bind the corporation to a contract.  *See E. Shore Brokerage & Comm'n Co. v. Harrison*, 118 A. 192, 195–96 (Md. 1922) ("Unless his authority is specially restricted, . . . a general or managing officer or agent . . . has

authority to do any act on its behalf which is usual and necessary in the ordinary course of the company's business.").

Even if Deller was not yet the general manager of Los Chillos, the evidence shows that he acted as an agent for the corporation.  An individual need not be an employee of the principal to act as an agent.  Rather, the essential characteristics of an agency relationship are that "(1) the agent is authorized to alter the legal relationship between the principal and third persons; (2) the agent is a fiduciary with respect to matters within the scope of the agency; and (3) the principal has the right to control the conduct of the agent with respect to matters within the scope of the agency."  *Prof'l Commc'ns, Inc. v. Contract Freighters, Inc.*, 171 F. Supp. 2d 546, 551 (D. Md. 2001); *see also Walton v. Mariner Health of Md., Inc.*, 894 A.2d 584, 591 (Md. 2006) (citing *Proctor v. Holden*, 540 A.2d 133, 142 (Md. App. 1988)).

There is no genuine dispute of material fact that Deller acted under the authority and control of Los Chillos.  In addition to the fact that Deller advised DDG that Los Chillos was the owner for the purpose of the HSL contract, DDG acknowledges that Deller negotiated the fees and other terms of HSL contract subject to the agreement of the other owners of Los Chillos. (Higgs Dep. 78; Lopez Dep. 78–79.).  Los Chillos itself acknowledges that Deller operated as an agent for the company.  And Deller continues to operate as an agent for Los Chillos in this lawsuit, even though he is no longer the general manager.  DDG has proffered no evidence that suggests Deller was not an agent for Los Chillos.[23]  Thus, there is no genuine issue of material fact as to the relationship.

"It is a well settled principle of agency law that an agent acting within the scope of his authority for a disclosed principal is not bound on a contract made in the principal's name."

---

[23] The only evidence that DDG raises is the fact that Urbanizadora's name was included on the contract.  But, as discussed below, the defendant's explanation for the inclusion of Urbanizadora is not contradicted by any of the deponents from DDG, and thus does not raise a genuine issue of material fact.

*Walton*, 894 A.2d at 591 (quoting *Local 1852 Waterfront Guard Ass'n of Port of Baltimore I.W.A. v. Amstar Corp.*, 363 F. Supp. 1026, 1030 (1973), *enforced*, 508 F.2d 839 (1974), *cert. denied*, 421 U.S. 1000 (1975)); *see also Curtis G. Testerman, Co. v. Buck*, 667 A.2d 649, 653 (Md. 1995) ("The rule in Maryland is clear that, 'if an agent fully discloses the identity of his principal to the third party, then, absent an agreement to the contrary, he is insulated from liability.'" (quoting *A.S. Abell Co. v. Skeen*, 288 A.2d 596, 597–98 (Md. 1972))).

Thus, Deller may only be liable for breach of the HSL contract if he later adopted or accepted the contract in his individual capacity. *See Snider Bros., Inc. v. Heft*, 317 A.2d 848, 851 (Md. 1974) ("[A] person not originally a party to a contract may later accept or adopt it, and he will then be bound by it."). DDG argues that Deller's "continued working relationship with DDG," including on the HSL, "demonstrate that he at least accepted or adopted the Hacienda Contract." (ECF No. 47, at 23.) Specifically, DDG notes that Deller "had agents, including Gabriela Ferro, contact DDG on his behalf, signed subsequent contracts for work on the Hacienda Project, and attended meetings with DDG or its agents." (*Id.* at 23–24.)

The above factual allegations, however, provide no basis for DDG to argue that Deller *expressly* adopted Los Chillos's contractual obligations, as did the defendant in *Snider Bros*. In that case, the defendant had agreed in a new contract, if certain payments were not made, that the original contract "'shall be binding upon' her." 317 A.2d at 851–52. DDG does not allege any such express language.

Acceptance can also "be accomplished by acts as well as words." *Porter v. Gen. Boiler Casing Co.*, 396 A.2d 1090, 1094 (Md. 1979). But neither do Deller's actions suggest an intent to be bound personally by the DDG-Los Chillos contract. During the time subsequent to the execution of the HSL contract, Deller was simultaneously the general manager of Urbanizadora

and Los Chillos.  Both companies were involved in executing the HSL contract.  There is no

evidence in the record to support the argument that Deller's continued interactions with DDG or

on the HSL project were carried out in his *individual* capacity, rather than in his capacity as an

agent for one of the two companies.  "Absent evidence that [Deller] unequivocally intended to be

bound" by the HSL contract, the court cannot conclude that a genuine issue of material fact

exists as to whether he personally adopted the contract.  *Residential Warranty Corp. v. Bancroft

Homes Greenspring Valley, Inc.*, 728 A.2d 783, 794 (Md. App. 1999) (finding that the trial court

did not err by granting summary judgment to the defendant).

Because Deller neither was a party to the contract nor subsequently adopted it, he cannot

be liable for the instant breach of contract action.  The court must therefore grant Deller's motion

for summary judgment and dismiss him as a defendant from the case.


### 2.  Urbanizadora

Like Deller, Urbanizadora was not an original party to the HSL contact.  While the

company's name appears on the signature page of the contract, the defendants argue

convincingly that this was a clerical error made by Lopez's secretary.  As noted above, Lopez

admits that Deller instructed him to prepare the contract with Los Chillos as the owner instead of

Urbanizadora.  Los Chillos does in fact appear as the owner on the final, unsigned, page of the

supplemental terms to the contract—the same page that contains the language on public

recognition.  (ECF No. 46-10, at 77.)  When questioned about the appearance of Urbanizadora's

name on the first signature page, Lopez suggested obliquely that this could have been the result

of an error due to the multiple versions of the contract that had been used.  (Lopez Dep. 77–79.)

As Lopez himself did not testify that he intended or believed Urbanizadora to be a party to the contract, then no genuine issue of material fact exists as to this claim.[24]

Neither is there any evidence that Urbanizadora expressly adopted the HSL contract or took any action to convey acceptance of the contract.  DDG alleges Urbanizadora "continued its involvement throughout the Hacienda Project, paying numerous DDG bills for work on the project" and that it provided the email address and the mailing address utilized by Deller for communications about the project.  (ECF No. 47, at 24).  These facts fall far short of the kind of actions that are "unequivocally intended" to convey acceptance of a contract by a non-party. *Residential Warranty*, 728 A.2d at 794.

Under certain circumstances, payment of contract bills might support a denial of summary judgment on a claim of non-party contract acceptance.  For example, where one company has been sold to another and there is a question about whether contract rights have been assigned to the new owners, the continued performance of contract obligations may raise a genuine issue of material fact about contract acceptance.  *See Mehul's Inv. Corp. v. ABC Advisors, Inc.*, 130 F. Supp. 2d 700, 708 (D. Md. 2001).  Or, where there is evidence that the defendant paid bills in order to obtain the benefit of performance by the plaintiff, summary judgment may be inappropriate.  See *Porter*, 396 A.2d at 1097.

Here, however, Los Chillos did not go out of business; the company continued to be the owner of the land and the HSL project.  There is no evidence that Urbanizadora, in paying the bills for Los Chillos, obtained any benefit to itself.  Deller's explanation of the relationship between Urbanizadora and Los Chillos, while convoluted, does not suggest acceptance or

---

[24] Alternatively, Deller could also have signed the contract on behalf of Urbanizadora, which was acting as an agent for Los Chillos.  But under this theory, as with Deller, Urbanizadora would not be liable as an agent of a disclosed principal.  *See Walton*, 894 A.2d at 591.

adoption of the contract by Urbanizadora.  Without more, Urbanizadora's act of paying the bills does not create a genuine dispute of material fact.

Urbanizadora neither was a party to the HSL contract nor accepted or adopted the contract.  Like Deller, therefore, Urbanizadora must be granted summary judgment and dismissed as a defendant in this case.


## **CONCLUSION**

For all of the above reasons, the defendants' motion to dismiss for lack of personal jurisdiction will be denied, and the motion for summary judgment on behalf of defendants Deller and Urbanizadora will be granted.

A separate order follows.


  March 30, 2012                                              /s/                      
Date                                                    Catherine C. Blake
                                                        United States District Judge